1

2

3

4

5

6

7

8 **UNITED STATES DISTRICT COURT**

9 **SOUTHERN DISTRICT OF CALIFORNIA**

10

11 NICKY ROTTENS INVESTMENT GROUP, INC., a California corporation,   Case No.: 3:12-CV-2173-JM (RBB)

12 Plaintiff,   **ORDER GRANTING MOTION TO DISMISS WITH LEAVE TO AMEND**

13 vs.

14 CITY OF CORONADO, a municipal corporation; BLAIR KING,

15 Defendants.

16

17       Plaintiff Nicky Rottens Investment Group ("NRIG") filed a complaint against the City

18 of Coronado (the "City") and City Manager Blair King (together "Defendants") on September

19 4, 2012 alleging that Coronado violated its constitutional rights to equal protection under the

20 Fourteenth Amendment and substantive due process under the Fifth Amendment.  NRIG filed

21 this action in federal court under 42 U.S.C. § 1983, the Federal Civil Rights Act.  Defendants

22 now move to dismiss NRIG's complaint for failure to state a claim.  For the reasons that follow,

23 this court grants the Defendants' motion to dismiss NRIG's complaint with leave to amend as

24 set forth below.

25      / / /

1

# I. BACKGROUND

## A. The Permits

Around July 2010, NRIG purchased a real property located at 100-104 Orange Avenue, Coronado, California 92118 (the "premises").  Compl. ¶ 3.  The premises previously consisted of a blighted bar named "Island Sports" and a Laundromat.  Id. ¶ 8.  NRIG wanted to convert the premises into "a world-class, family-friendly, neighborhood [r]estaurant which caters to and serves the residents, guests and tourists of the City of Coronado, San Diego County, California, the United States, and the world" (the "Restaurant").  Id. ¶ 11.

To achieve this vision, in September 2010, NRIG submitted applications to the City for an Encroachment Permit, which would allow NRIG to install railings defining an outdoor dining area, and a Use of City Property for Commercial Activity Permit ("Commercial Use Permit"), which would permit NRIG to use the outdoor area to serve food and drinks (together the "Permits").  Id. ¶ 5.  Along with the premises, NRIG also purchased the Island Sports' liquor type "48" license, which it sought to downgrade to a type "47" license that would permit it to serve families and minors in the same establishment.[1]  Id. ¶ 4.

Prior to the City Council's requisite meeting to approve the permits, NRIG met with nearby condominium complex residents to discuss any concerns based on previous problems with Island Sports.  Id. ¶ 23.  NRIG claims that it "agreed to consider the homeowners' association's speculative concerns about the alleged impact that the Restaurant might possibly have on the neighborhood."  Id.

At its January 18, 2011 meeting, the City Council took up NRIG's application for the Permits, along with three similar Encroachment Permit applications submitted by Saiko Sushi ("Saiko"), Sapori, and Coronado Firehouse Restaurant ("Coronado Firehouse").  Id. ¶ 18.

---

[1] Establishments with type "48" licenses may not permit minors to enter the premises.

2

Saiko, Sapori, and Coronado Firehouse are similar to the Restaurant, include full bar service, and were already operating at the time of this hearing.  Id.  The Restaurant was not yet in operation.  Id. ¶ 27.  Saiko and Sapori had previously been granted temporary Encroachment Permits in December 2009.  Coronado Firehouse had also previously been granted a temporary Encroachment Permit in June 2010.  Id.  All had previously received these Encroachment Permits subject to annual review.  Id. ¶ 36.  The City Council granted these establishments renewed permits for twelve months without imposing any conditions at the meeting.  Id. ¶ 27.  To date, the City has not placed any conditions on permits issued to Saiko, Sapori, Coronado Firehouse, or three other restaurants located in the immediate vicinity.[2]  Id. ¶ 15.

NRIG's approval process did not go nearly as smoothly.  At this meeting, the City's Director of Engineering and Project Development, Ed Walton, brought forth a list of the nearby condominium complex residents' concerns that NRIG had agreed to consider and a list of conditions to address these concerns.[3]  Id. ¶ 25.  Coronado resident Marilyn Field had drafted both lists and emailed them to the City.  Id.  Walton inserted most of Field's recommendations

---

[2] The other restaurants are: The Little Club located at 132 Orange Avenue; Coronado Brewing Company located at 170 Orange Avenue; and Tartine located across the street from the Restaurant at 1106 1st Street.  Compl. ¶ 15.

[3] These concessions include:

1. Triple pane noise controlling windows and skylight closed.
2. Outdoor diner will close at 10:00 p.m. and the windows will be closed.
3. Last call for drinks will be well in advance of 1:30 a.m. with patrons leaving the bar before 2 a.m.
4. Security guard patrolling the surrounding area from 10:00 p.m. until after closing.
5. Outside smoking to be limited to small area on South end of patio.
6. Trash, garbage, and bottle collection system to be indoors in a ventilated room and the trash will be picked up by Waste Management.  No trash outside on street.
7. No sports TVs outside.
8. Indoor sports TVs shall be positioned away from patio dining and shall not be audible on the patio. Windows [are] to be closed if TVs are audible outside.
9. Windows shall be closed at any time there is live entertainment.

Compl. ¶ 25.

in his Staff Report.[4]  Id. ¶ 25.  Field's email was included in the City Council's agenda.  Id. ¶ 28.

A few City officials expressed concerns about these concessions.  Defendant King and City Attorney Morgan Foley believed that any use limitations attached to the permit should only address activities within the encroachment area.  Id. ¶ 29.  Councilmember Carrie Downey expressed concern about the City's attempt to dictate how NRIG ran its business.  Id. ¶ 31.  The City Council also acknowledged that "it had not imposed similar conditions on other similarly situated businesses."  Id. ¶ 30.

Nevertheless, the City Council ultimately voted unanimously in favor of issuing the Permits with all but one of Field's proposed conditions.[5]  The Commercial Use Permit was granted from January 18, 2011 to June 30, 2015, but the Encroachment Permit was subject to review every six months.  Id. ¶ 36.  The Encroachment Permit stated that "[p]ermittee hereby waives the right to assert any claim or action against the City of Coronado, its officers, agents or employees arising out of or resulting from the issuance or revocation of this permit or the restoration of the property or any other action taken in accordance with the terms of the permit by the city of Coronado, its officers, agents or employees."  MTD, Ex. A at ¶ 5.  NRIG signed the Permits under protest and thus believes that it did not waive any of its rights by signing these Permits.  Compl. ¶ 34.

---

[4] Specifically, he recommended the following concessions:

1. Stopping outdoor dining at 10 p.m.,
2. Requiring that all windows on Orange Avenue be closed at 10 p.m.
3. Banning smoking on the patio or limiting it to the south end of the patio area.
4. Prohibiting amplified sound in the patio area.
5. Requiring triple pane windows along Orange Avenue.

Compl. ¶ 26.

[5] The only concession not included was that the last call for drinks be well in advance of 1:30 a.m. with patrons leaving the bar before 2 a.m.  Compl. ¶ 32.

On June 7, 2011, the City Council reviewed NRIG's Encroachment Permit along with a request by NRIG for minor changes to the Encroachment Permit necessary to comply with the Americans with Disabilities Act.  Id. ¶¶ 39, 40.  The City Council renewed NRIG's Encroachment Permit with the requested changes, but it added an additional condition requiring that patrons seated in the outdoor dining area order food.  Id. ¶ 42.  This permit contained the same waiver language as the originally issued Encroachment Permit.  MTD, Ex. B at ¶ 5.  NRIG accepted, albeit begrudgingly, the newly issued Encroachment Permit.

On September 1, 2011, NRIG was granted a Temporary Certificate of Occupancy for the Restaurant and began operating the Restaurant.  Compl. ¶ 45.

On January 17, 2012, NRIG's Encroachment Permit came up for review, and the City Council discussed using Commercial Use Permits as vehicles to enforce certain conditions.  Id. ¶ 46, 52.  At this meeting, Defendant King noted that "[t]he Commercial Activity Permit is a device that had typically been used by the City to collect revenue for the public's use of the right-of-way.  In talking to staff, only recently, and specifically with [NRIG] permits did it become a tool for an imposition of conditions.  It is probably not the best tool to do that but the reason the Council did that is because there was no other tool available to it. . . .  In talking to staff, they are unaware of any proactive enforcement post Certificate of Occupancy for any type of permit – minor use permit, parking plans and this as well."  Id. ¶ 52.  Although the meeting revealed no problems with the Restaurant, Council members approved NRIG's permits with the caveat that City staff perform "objective assessments" of NRIG's compliance with permit conditions.  Id. ¶¶ 47-55.  Pursuant to this new condition, the City's Assistant Manager, Tom Ritter, conducted at least four secret inspections between January 17, 2012 and July 17, 2012.  Id. ¶ 57.

On July 17, 2012, NRIG's Encroachment Permit was again up for review.  Id. ¶ 59.  The City's Mayor noted that NRIG had met the permit's requirements.  Id. ¶ 59.  City

Councilmember Woiwode noted that NRIG "noise complaints were not a significant issue for NRIG but they were a significant issue for other establishments [located on the Restaurant's block]."  Id. ¶ 61.  However, City Councilmember Denny complained that the Restaurant was a "Gaslamp" type bar and a "nightclub masquerading as a family restaurant."  Id. ¶ 62.  NRIG again protested the conditions at this meeting.  Id. ¶ 63.  The City Council approved NRIG's permit, but refused to remove the Encroachment Permit's attached conditions.  Id.  NRIG assented to the Encroachment Permit's conditions and did not appeal these conditions.  Id.

**B. The Laundromat and Mezzanine Spaces**

Coronado's Orange Avenue Corridor Specific Plan ("OACSP"), Chapter IV, Section J.2c-g, requires a new eating and drinking establishment to provide one parking space per hundred square feet of floor area unless it occupies the same space as a former eating and drinking establishment that was grandfathered in because it existed prior to the OACSP.  Id.; OASCP Ch. IV, J.2.c.; OASCP Ch. IV, J.2.g.

The City determined that the area previously housing Island Sports was exempt from this requirement because it was a grandfathered eating and drinking establishment.  However, the City declined to extend this exemption to the area that previously housed the Laundromat or the mezzanine space, which had never been used by Islands Sports.  Id. ¶ 67.  The City has permitted NRIG to use the Laundromat area as "retail" space, but required NRIG to install a half-height wall before doing so.  Id. ¶ 68.

NRIG complains that the City's incorrect application of local code has prevented it from using the space previously occupied by the Laundromat and the mezzanine floor in the Restaurant.  Id. ¶ 64.  NRIG notes that the premises previously housed one restaurant before it was divided into the Laundromat and Island Sports.  NRIG asserts that "the City had grandfathered other similarly situated establishments after they expanded, but, unreasonably and

1    irrationally, not NRIG." Id. ¶ 67.  However, NRIG failed to provide any examples of differing

2    treatment.

3              To be able to use the space previously housing the Laundromat, NRIG proposed that it

4    lease five parking spots belonging to a hardware store on the same block as the Restaurant.  Id.

5    ¶ 69.  The City Council approved this arrangement so long as NRIG provided valet parking for

6    these spaces.  Id.  After some delay, the City Council also issued NRIG a corresponding Permit

7    for Use of City Property for Commercial Activity: Valet Services ("Valet Permit").  Id. ¶¶ 70,

8    72.  Upon issuing the Valet Permit, the City's Tom Ritter informed NRIG that it could not

9    charge for the valet parking.  Id. ¶ 73.  If NRIG elected to charge for the valet parking, Ritter

10   informed NRIG that it would be "out of business" and that its Valet and Encroachment Permits

11   might be delayed or taken away.  Id. ¶¶ 73, 74.

12             The City has also prohibited NRIG from enforcing the no-parking sign, thereby

13   preventing NRIG from actually offering the valet parking that the City required NRIG to offer.

14   Id. ¶ 75.  NRIG alleges that the City enforces the no-parking rules for valet spaces, which

15   permits other businesses to operate their valet parking services effectively.  Id. ¶ 77.

16             **C.  The State-Issued Alcohol Permit**

17             NRIG claims that the City has intentionally and improperly interfered with its

18   application to the California Alcoholic Beverage Control ("ABC") to downgrade its type 48

19   license to a type 47 license.  Id. ¶ 80.  The ABC advertises that a permit application should take

20   180 days to process.  Id. ¶ 89.  NRIG believes that such conversions are usually routine.  Id. ¶

21   109.  However, the process has been delayed because the City refuses to acknowledge that the

22   premises are properly zoned for alcohol or that NRIG has the necessary permits.  Id. ¶ 81.  King

23   further complicated the conversion process by sending separate letters to ABC Licensing

24   Representative Rebekkah Horowitz and ABC District Administrator Jennifer Hill requesting

25   that the City's conditions on NRIG's Permits be extended to its alcohol license.  Id. ¶ 83-86.

7

1    NRIG believes that the City's interference has led to a delay in the ABC's approval of its

2    application.  Id. ¶ 89.

3        **D.  Claims**

4        NRIG believes that  it "has been the target of improper harassment and unreasonably

5    stricter code enforcement, arbitrary and unreasonable land use regulations and/or unreasonable

6    and unnecessary special conditions, and other unequal treatment because the City and/or certain

7    members of the City government (including, but not limited to, City Council members Barbara

8    Denny and Mike Woiwode) and/or City staff (including, but not limited to Blair King, Peter

9    Fait and Tom Ritter, and others) have spite, an irrational or unreasonable personal animus or

10   vendetta against NRIG, and/or its owners, and/or unreasonably do not like NRIG, the owners

11   and/or prior owners of NRIG, and/or the image, brand, logo, marketing and/or name of NRIG."

12   Id. ¶ 15.  Accordingly, NRIG has filed two claims alleging that Coronado violated (1) its

13   constitutional right to equal protection under the Fourteenth Amendment and (2) its

14   constitutional right to substantive due process under the Fifth Amendment.

15   **II. DISCUSSION**

16   **A. Legal Standard**

17       For Plaintiffs to overcome this 12(b)(6) motion, their "[f]actual allegations must be

18   enough to raise a right to relief above the speculative level."  Bell Atl. Corp. v. Twombly, 550

19   U.S. 544, 555 (2007).  In evaluating the motion, the court must construe the pleadings in the

20   light most favorable to the non-moving party, accepting as true all material allegations in the

21   complaint and any reasonable inferences drawn therefrom.  See, e.g., Broam v. Bogan, 320 F.3d

22   1023, 1028 (9th Cir. 2003).  The court should grant 12(b)(6) relief only if the complaint lacks

23   either a "cognizable legal theory" or facts sufficient to support a cognizable legal theory.

24   Balistreri v. Pacifica Police Dep't, 901 F.2d 696, 699 (9th Cir. 1990).

25

For plaintiff to be entitled to a remedy under § 1983, the plaintiff must prove (1) that the defendant acted under the color of law in committing the conduct at issue, and (2) such conduct deprived plaintiff of some right, privilege, or immunity protected by the Constitution or laws of the United States.  42 U.S.C. § 1983; <u>Haygood v. Younger</u>, 769 F.2d 1350, 1354 (9th Cir. 1985) (en banc).  The court must then determine if the defendant can be held liable under § 1983 or may claim any immunity from suit.  In the case of municipalities, the court cannot hold a municipality liable under § 1983 unless that the municipality acted pursuant to an official policy, custom, or usage adopted by the municipality's officers.  <u>Monell v. Dept. of Social Servs. of N.Y.</u>, 436 U.S. 658, 691 (1978).

**B. Discussion**

**1. Preclusion Under California Civil Procedure Section 1094.5**

Defendants claim that NRIG is barred from seeking relief under § 1983 because NRIG failed to challenge the Permits under California Civil Procedure § 1094.5 ("Cal. Civ. § 1094.5") proceeding (referred to as an administrative mandamus),[6] which is the "exclusive remedy for judicial review of quasi-adjudicatory administrative action of the local-level agency."  <u>City of Santee v. Superior Ct.</u>, 228 Cal. App. 3d 713, 718 (1991).  A permit holder's failure to contest a permit's validity through administrative mandamus estops the permit holder from later re-litigating the permit's validity.  <u>Santee</u>, 228 Cal. App. 3d at 718-19 (citing (<u>Rossco Holdings Inc. v. State of California</u>, 212 Cal. App. 3d 642, 656-57 (1989); <u>California Coastal Com. v. Superior Court</u>, 210 Cal. App. 3d 1488, 1494, 1499-1500, n. 8 (1989)).

---

[6] Cal. Civ. § 1094.5 provides: "Where the writ is issued for the purpose of inquiring into the validity of any final administrative order or decision made as the result of a proceeding in which by law a hearing is required to be given, evidence is required to be taken, and discretion in the determination of facts is vested in the inferior tribunal, corporation, board, or officer, the case shall be heard by the court sitting without a jury."

In <u>United States v. Utah Construction & Mining Co.</u>, 384 U.S. 394 (1966), the Supreme Court held that federal common law provides that administrative proceedings may be given the preclusive effect accorded to a court provided that an administrative agency is "acting in a judicial capacity and resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate." <u>Id.</u> at 422.  <u>See also</u> <u>Plaine v. McCabe</u>, 797 F.2d 713, 721 (9th Cir. 1986).  California has adopted the federal standard for preclusion specified in <u>Utah Construction</u>, so this court need not look beyond California's preclusion law.  <u>Miller v. Cnty. of Santa Cruz</u>, 39 F.3d 1030, 1032 (9th Cir. 1994); <u>Plaine</u>, 797 F.2d at 719-20.

California's judicial exhaustion doctrine provides that an administrative proceeding has preclusive effect if it includes several judicial characteristics such as, but not limited to, "testimony under oath, the opportunity to call witnesses and introduce evidence, and a formal record of the hearing."  <u>McDonald v. Antelope Valley Cmty. Coll. Dist.</u>, 45 Cal. 4th 88 (2008); <u>see also</u> <u>Y.K.A. Indus., Inc. v. Redevelopment Agency of San Jose</u>, 174 Cal. App. 4th 339, 357 ("Indicia of proceedings undertaken in a judicial capacity include a hearing before an impartial decision maker; testimony given under oath or affirmation; a party's ability to subpoena, call, examine, and cross-examine witnesses, to introduce documentary evidence, and to make oral and written argument; the taking of a record of the proceeding; and a written statement of reasons for the decision."); <u>People v. Sims</u>, 32 Cal. 3d 468, 479-80 (1982) (analyzing whether the administrative proceeding included factors such as requiring witnesses to testify under oath, an impartial hearing official, the parties' ability to subpoena witness, and maintenance of the adjudicative record).  Notably, no case cited by either party has ever held that these administrative proceedings must include every judicial characteristic listed therein.  But Defendants correctly note that similar local-level agency decisions regarding permits have been recognized as having preclusive effect in California state courts.  <u>See, e.g.</u>, <u>Briggs v. City of Rolling Hills Estates</u>, 40 Cal. App. 4th 637, 645-48 (1995) (noting that this statute constitutes a

form of res judicata, not a requirement to exhaust administrative remedies); Santee, 228 Cal.

App. 3d at 718 (upholding the city's revocation of a builder's occupancy permit for failure to

comply with additional conditions the city placed on the building and noting that builder should

have sought an administrative mandamus).

NRIG counters that its § 1983 claims for substantive due process and equal protection

violations are not precluded by Cal. Civ. § 1094.5 because the City's hearing did not provide

NRIG with an adequate opportunity to litigate the Permits' conditions as required by Utah

Construction.[7]  Specifically, NRIG argues that "there was no impartial decision maker, no

testimony under oath, no subpoena power, no opportunity to call, examine or cross examine

witnesses . . . [no] ability to introduce documentary evidence, [or] make any written argument

. . . ."  NRIG Opp. at 11.  NRIG's most compelling claim is that the City Council hearing lacked

an impartial decision maker.  City officials recognized that NRIG was being uniquely targeted

and that other businesses were not subject to the same conditions.  Compl. ¶¶ 29-31, 49-52, 62.

NRIG further argues that having the federal government shield local government

officials from constitutional scrutiny by giving preclusive effect to the City Council's allegedly

discriminatory proceedings would be "counterintuitive."  Guru Nanek Sikh Soc'y of Yuba v.

Sutter, 326 F. Supp. 2d 1128 (E.D. Cal. 2003); Contasti v. City of Solana Beach, 2012 WL

4109207 (S.D. Cal., Sept. 18, 2012) ("The Court finds that the primary right presented by

Plaintiffs in this action is outside the scope of the issue that was litigated during the City

Council hearings.  The Court concludes that the preclusive effect of the City Council's decision

does not extend to the substantive due process claim presented in this federal action."); Jensen

v. City of Sonoma, 2008 WL 5048203 (N.D. Cal. 2008) (concluding that a state administrative

---

[7] The court declines to address Plaintiff's argument that administrative exhaustion need not be shown according to Patsy v. Board of Regents, 457 U.S. 496 (1982), because the Defendants do not contend that NRIG failed to exhaust its administrative remedies before seeking relief in court.  Rather, the Defendants have asserted that the City Council's decision to provide NRIG with a discretionary permit is precluded because NRIG failed to challenge the City Council's decision by administrative mandamus.

1  decision did not preclude Plaintiff's alleged constitutional claims as those claims arose out of

2  conduct at the administrative hearing).

3       Although NRIG might have validly brought these § 1983 claims had its permit

4  applications been denied following a contested hearing including the taking of evidence,

5  creation of a record, and a reasoned decision, NRIG failed to contest conditions imposed upon

6  the issued permits other than to verbally object to the conditions while accepting their

7  limitations.  NRIG does not allege that the conditions have been imposed following the taking

8  of evidence, including witness testimony,[8] and further that NRIG has elected to stand on its

9  application(s).  Rather, under the present complaint, NRIG has attempted to have its cake and

10 eat it too, i.e., to operate its restaurant under the complained of permits and simultaneously sue

11 the City for substantial damages and injunctive relief under § 1983.  This matter is therefore not

12 ripe for review because no live controversy exists at present.  Whether the underlying

13 administrative action is ripe for judicial review requires the court to evaluate "(1) the fitness of

14 the issues for judicial decision and (2) the hardship to the parties of withholding court

15 consideration."  Nat'l Park Hospitality Ass'n v. Dep't of Interior, 538 U.S. 803, 808 (2003).

16 The basic rationale of the ripeness doctrine "is to prevent the courts, through avoidance of

17 premature adjudication, from entangling themselves in abstract disagreements."  Murphy v.

18 New Milford Zoning Comm'n, 402 F.3d 342, 347 (2d Cir. 2005) (quoting Abbott Labs. v.

19 Gardner, 387 U.S. 136, 148 (1967).  While a property owner need not necessarily pursue an

20 available administrative procedure where to do so would be futile, id. at 349, "[t]he ripeness

21 doctrine cautions a court against premature adjudication of disputes involving administrative

22 policies or decisions not yet formalized and felt in a concrete way by the challenging parties."

23 Signature Props. Int'l Ltd. P'ship v. City of Edmond, 310 F.3d 1258, 1265 (10th Cir. 2002).

24

25

---

[8] Although NRIG argues that it had no opportunity to present evidence or be otherwise heard, it has not alleged that no right to a hearing with a reviewable record exists such that § 1094.5 review is illusory.

1    Presently, the City has granted NRIG permits to operate its business with various

2    conditions, which NRIG has accepted despite its protests.  Such acceptance, even when couched

3    with protests, means that the parties have reached an agreement that this court should respect.

4    Allowing NRIG to both benefit from the conditioned permits while seeking § 1983 relief in

5    federal court is tantamount to permitting NRIG to use the threat of litigation to obtain

6    concessions in a negotiation about how to address possible concerns about its business.  As

7    such, the City's issuance of conditioned permits is not fit for judicial review.

8    Moreover, the current benefit derived by NRIG from accepting these Permits outweighs

9    the hardship NRIG will suffer if this court refrains from adjudicating this matter.  But if NRIG

10    were to apply for permits, and the City were to deny an application(s), then, in the absence of

11    NRIG accepting different treatment, an active controversy would exist and NRIG would be

12    facing the hardship necessary for its claims to be ripe.[9]  This court therefore declines to reach

13    the merits of NRIG's § 1983 equal protection and substantive due process claims regarding the

14    Permits' conditions.  If NRIG were to allege an administrative hearing has been conducted with

15    the taking of evidence, creation of a record, and issuance of a reasoned decision, or that such a

16    procedure is unavailable, then upon the City's unequivocal denial of NRIG's application(s),

17    NRIG's claims would be arguably ripe.  Leave to amend should therefore be granted for NRIG

18    on this basis.

19    Finally, NRIG's claim regarding the City's failure to provide the ABC with the

20    information necessary to downgrade its type 48 license to a type 47 license may be ripe for

21    review if NRIG adequately pleads that no further administrative or appeals process to compel

22    the City to provide the ABC with the necessary information exists.  If this is the case, then

23    NRIG may be able to state § 1983 claims seeking relief.  NRIG has also failed to allege that

24

25

[9] Assuming that NRIG unsuccessfully attempts to obtain permits with conditions similar to other similarly situated businesses from the City, this court notes that NRIG may well be able to successfully plead its § 1983 claims.

King was directly responsible for communicating certain information to ABC so that NRIG could downgrade its license.  Accordingly, NRIG will be given leave to amend this claim.

   In conclusion, although many of the current allegations raise constitutional concerns, it is not clear from the complaint that NRIG's asserted claims are ripe for review by this court.  If they are not presently ripe, there appears to be a clear path to make them so.

   **IT IS SO ORDERED.**

DATED: November 27, 2012

**Jeffrey T. Miller**
**United States District Judge**